381 So.2d 385 (1979)
Sol KAPLAN et al.
v.
UNIVERSITY LAKE CORPORATION et al.
No. 64328.
Supreme Court of Louisiana.
October 8, 1979.
On Rehearing March 3, 1980.
Rehearing Denied April 7, 1980.
*386 Floyd J. Falcon, Jr., Avant, Wall, Thomas, Riche & Falcon, Baton Rouge, William P. Stahl, Reynolds, Nelson, Theriot & Stahl, New Orleans, for defendant-applicant.
Ashton L. Stewart, Stewart & Preis, Baton Rouge, for plaintiff-respondent.
DENNIS, Justice.
In this suit to enforce a mortgage on immovable property, both the trial and intermediate appellate courts rendered judgment for the plaintiff mortgage-holder, Kaplan, rejecting a plea of prescription filed by the defendant landowner, Guaranty Savings Assurance Company. We reverse, holding that the mortgage is unenforceable. Prescription on the debt underlying the mortgage was not interrupted by a pledge of contracts to sell securing the debt, as held by the lower courts, because the contract obligations had been revoked, leaving nothing in the pledgee's possession to serve as a constant acknowledgement of the prescribed debt.

Facts
University Lake Corporation obtained approval for a loan from the American Bank in 1963 for the purpose of developing a small residential subdivision on 15.19 acres of land in East Baton Rouge Parish. In connection with the loan, Lake Corporation executed a $144,000 hand note with itself as maker. The hand note was secured by the pledge of a $144,000 note which was paraphed "ne varietur" with an act of collateral mortgage on the land to be developed.
Lake originally planned to develop 18 residential lots fronting on a single street between two man-made lakes. The corporation had entered contracts to sell all 18 lots with its five principal stockholders and officers. In connection with the bank loan, Lake pledged to the bank the contracts to sell the 18 residential lots to secure the ne varietur note.[1]
American Bank advanced Lake a total of $132,000. The original plan of development fell through and was replaced by an apartment complex plan, which called for landfilling the entire development instead of digging man-made lakes. The bank began to press Lake for payment of the loan. Lake sold a 60% undivided interest in the property under development to Ingram Contractors, Inc. on November 3, 1964 in return for Ingram's agreement to do the landfill necessary for the apartment complex. Lake asked for forbearance in view of Ingram's landfilling operations and paid only interest on the loan for the next eighteen months. On June 24, 1966 the bank sold the obligation represented by the hand note with all its accompanying security devices to Seymour Weiss for $133,848.
Sol Kaplan and the National American Bank, as executors of the Succession of Seymour Weiss, filed suit on the notes and security devices on November 15, 1974. By this time the property subject to the collateral mortgage had changed hands a number of times until it was acquired on June 15, 1971 by Guaranty Savings Assurance Company. In taking title to the property Guaranty assumed all mortgages extant against the property.
Following a trial the district court rendered judgment for the plaintiffs, Kaplan, *387 et al., in the amount of $132,000 and ordered enforcement of the collateral mortgage against the property. On appeal, the court of appeal affirmed, adopting the trial court's written reasons. We granted writs to review the decisions below with respect to the issue of prescription. After reviewing the record and considering the parties' arguments on all issues, we affirm the judgment below as to the money judgment, but reverse on the issues of prescription and enforceability of the collateral mortgage.

Issues to be Decided by this Court
The central issue in this proceeding is whether prescription was interrupted on the note secured by the collateral mortgage. If prescription was not interrupted, it is clear that the liberative period has elapsed.[2] A decision of this issue calls upon us to answer or reappraise two questions: (1) Does prescription run in favor of the debtor whose debt is secured by a pledge, or does it in fact remain interrupted, as long as the pledgee possesses the thing pledged? and (2) When the thing pledged is the obligation of a third person, does revocation of the obligation remove it from the possession of the pledgee?

1. A Brief Reappraisal of the "Constant Acknowledgment" Rule
This Court will continue to apply the rule that prescription does not run in favor of the debtor whose debt is secured by a pledge, and that it remains interrupted, as long as the thing pledged is in the possession of the pledgee. However, it is not the contract or act of pledge that interrupts prescription, but rather the detention by the pledgee of the thing pledged, such possession serving as a constant acknowledgment of the debt and hence a constant renunciation of prescription.[3] See Succession of Picard, 238 La. 455, 115 So.2d 817 (1959); Scott v. Corkern, 231 La. 368, 91 So.2d 569 (1956). This rule, which may be referred to as the "constant acknowledgment" rule, has also been recognized by French commentators. 2 pt. 2 M. Planiol, Traite Elementaire de Droit Civil, § 2462. Moreover, the rule has become interwoven in our security devices law, and the financial and legal communities have come to regard it as one of the unique advantages of the collateral mortgage. Nathan and Marshall, The Collateral Mortgage, 33 La.L.Rev. 497 (1973). Clarification of the rule is needed, however, in view of the prevailing confusion about the meaning of Picard. See Comment, Pledge, Prescription and the Succession of Picard, 10 Loy.L.Rev. 82, 84 (1959).

2. Clarification of the "Constant Acknowledgment" Rule and Succession of Picard
When the pledgee loses possession of the thing pledged, prescription is no longer interrupted, despite the pledgee's continued detention of the written evidence of the thing pledged. Confusion on this point may have arisen because we held in Succession of Picard, supra, without fully explaining our rationale, that the pledgee's detention of a pledged promissory note after it had prescribed served to interrupt prescription of the primary debt. We should have pointed out that the pledgee in that case did not *388 lose possession of the thing pledged. The thing pledged was the promisor's obligation to pay as specified in the promissory note.[4] When an action is barred by prescription, the civil action is extinguished, but a natural obligation still subsists. La.C.C. art. 1758(3). In contrast to civil obligations, natural obligations do not give rise to a right of action. Nevertheless, they are not completely devoid of legal consequences. La.C.C. art. 1759; 1 C. Aubry & C. Rau, Droit Civil Francais, § 297 (La.St.L.Inst.Transl.1965). For this reason it is said that prescription constitutes an obstacle, since the creditor cannot effectively sue for the performance of the obligation, but does not extinguish the obligation itself. Aubry & Rau, supra, § 314. Therefore, in Picard it was the pledgee's continued detention of the obligation pledged, subsisting as a natural obligation, which interrupted prescription, not merely his possession of the promissory note instrument.[5] The instrument, a corporeal thing, was merely evidence of the incorporeal obligation pledged. It was not the thing pledged. La.C.C. arts. 460, 2481, 3156.

3. Application of the "Constant Acknowledgment" Rule to this Case
The detention by the bank and its assigns of the pledged contracts to sell in this case did not serve to interrupt prescription on the primary debt because the thing pledged, the obligation of Lake's officers and directors to buy the 18 lots, was revoked by mutual consent of the parties.
On our review of the record in this case we find it more probable than not that Lake and its principal owners and officers by mutual consent revoked the contracts to sell the residential lots. Lake abandoned its plan of residential development and undertook an apartment complex project. The new plan of development was radically different from and entirely inconsistent with the proposed sales of eighteen one-family homesites. Lake sold a 60% undivided interest in the property to Ingram, and Ingram began landfilling operations as part of the apartment project. The principal owners and officers either actively participated in these transactions, or, by their knowing failure to object, acquiesced in them. Accordingly, the evidence preponderates in favor of a conclusion that the parties to the contracts to sell the eighteen residential lots agreed to revoke the contracts. Although agreements formed according to law bind those who make them, they can be revoked by mutual consent. See La.C.C. art. 1901.[6]
The record reflects that the American Bank probably consented to Lake's new plan of development, as well as the revocation of the contracts to sell and the sale of the 60% undivided interest to Ingram, which were essential elements of the apartment complex plan. Although there is no evidence that the bank expressed its agreement, the bank was informed of the change in the development plan, the transfer of a majority interest to Ingram, and Ingram's commencement of landfill operations. Thus the bank was aware that the land would not be subdivided into eighteen residential lots and sold under the contracts to sell. These facts certainly put the bank on notice that Lake and its officers had abandoned or *389 revoked the contracts to sell by mutual consent. Following these events the bank, at Lake's request, postponed its demand of payment of the collateral mortgage obligation for eighteen months during the Ingram excavation. At the end of this period the bank sold the loan without once complaining of Lake's actions in changing to an apartment plan, selling 60% of the development to Ingram or the revoking of the residential contracts to sell. Under these circumstances, it is not necessary that we decide whether the parties intended by the pledge contract to restrict Lake's freedom to develop the property in the manner it deemed most profitable. Nor must we determine precisely what the bank's rights would have been against the pledgor, debtor of the pledged obligation, and third persons, if the pledge had been destroyed or impaired without the bank's consent. See, e. g., La.C.C. arts. 3158, 3173. The evidence is convincing that the bank, in hopes of improving the value of its collateral mortgage, consented to the good faith transactions between Lake, its management, and Ingram, which were undertaken in the interest of a successful development of the property.
Accordingly, the things pledged, the purchasers' obligations to buy the eighteen residential lots under the aborted development plan, were revoked and ceased to exist from the time of the sale of the majority interest in the property to Ingram on November 3, 1964. Beginning on this date prescription was no longer interrupted because the pledgee did not have the things pledged, the revoked incorporeal obligations, within its possession. Far more than the required time for liberative prescription of the collateral mortgage obligation having elapsed before the filing of this suit, the collateral mortgage is now unenforceable.
Although the collateral mortgage note is prescribed and the mortgage is unenforceable, the hand note and the original obligation, which Guaranty Savings Assurance Company assumed in its act of sale, have legal validity. The court of appeal correctly held that the collateral mortgage note, because the pledgee and his assigns retained it, operated as a constant interruption of prescription of the hand note. Succession of Picard, supra; Meyer Brothers v. Colvin, 122 La. 153, 47 So. 447 (1908).
For the foregoing reasons we reverse the trial court and court of appeal judgments insofar as they enforce the collateral mortgage, and we affirm the judgments of the lower courts with respect to the $132,000 money judgment on the hand note.
REVERSED IN PART; AFFIRMED IN PART.
SUMMERS, C. J., dissents. I would enforce the collateral mortgage and also affirm the judgments of the lower courts with respect to the $132,000 money judgment on the hand note.

ON REHEARING
LANDRY, Justice ad hoc.
A rehearing was granted Guaranty Savings Assurance Company (GSA) to reconsider the propriety of our holding said defendant liable in the amount of $132,000.00 on a hand note dated October 22, 1963, which note, executed by University Lake Corporation, was secured by a collateral mortgage note for $144,000.00 in turn secured by a mortgage on a 15.19 acre tract of land situated in East Baton Rouge Parish. We reverse and now find that GSA is not liable on the hand note.
Plaintiffs, present holders of the hand note, collateral note and collateral mortgage, also applied for a rehearing on the ground that we erred in holding the collateral mortgage note has prescribed and the collateral mortgage is unenforceable. Plaintiffs' application for rehearing was denied.
Under the procedural posture thus presented, the matter is before us on rehearing only with respect to GSA's claim that it is not liable on the hand note.
The facts pertinent to the issue on rehearing are that on June 15, 1971, GSA purchased from International Speedways, Inc., a North Carolina Corporation, the *390 property subject to the collateral mortgage which secured the hand note herein sued upon. The act of transfer to GSA provides a stipulated purchase price
"which is represented by purchaser assuming binding and obligating itself, its successors and assigns to pay all mortgages, judgments and valid liens now extant against the property...".[1]
On initial hearing we held that:
"Although the collateral mortgage note is prescribed and the mortgage is unenforceable, the hand note and the original obligation, which Guaranty Savings Assurance Company assumed in its act of sale, have legal validity. The court of appeal correctly held that the collateral mortgage note, because the pledgee and its assigns retained it, operated as a constant interruption of prescription of the hand note. Succession of Picard, supra, Meyer Brothers v. Colvin, 122 La. 153, 47 So. 477 [447] (1908)."
Our error consisted in holding GSA liable on the hand note despite the finding that the collateral mortgage note, given in security therefor, had prescribed at the time GSA purchased subject property and assumed all mortgages then extant against the property. More particularly, in so holding we overlooked the salient fact that upon prescription of a collateral mortgage note given in security for a hand note, the hand note reverts to a purely personal obligation of its maker and no longer represents a viable claim against the property subject to the prescribed collateral mortgage note.
In this regard we cite with approval the following from M. Nathan & G. Marshall, The Collateral Mortgage, 33 La.L.Rev. 497, pp. 507-508 (1973):
"A unique advantage of the collateral mortgage device is that the `hand note,' which is the true evidence of indebtedness, is imprescriptible. It is a well-recognized principle of Louisiana law that where a debt is secured by pledge, the holding of the pledged item by the creditor serves as a constant acknowledgment of the debt by the debtor so as to continually interrupt prescription. Thus, in Scott v. Corkern, where a promissory note was secured by the pledge of a life insurance policy, and nearly 30 years had passed with no payments or other acknowledgements of the debt, the court nonetheless found that the principal obligation had not prescribed because the existence of the pledge served continually to interrupt prescription. Applying this legal principle, the pledge of the `ne varietur' note serves as a constant acknowledgment of the debt that is evidenced by the hand note and thereby continually interrupts prescription on the hand note. There is even jurisprudence to the effect that if one promissory note is pledged to secure another promissory note, and the note that is pledged prescribes, nonetheless, the prescribed note will serve to continually interrupt prescription on the other note. So long, then, as the creditor holds the `ne varietur' note in pledge behind the hand note, the hand note is imprescriptible.

PRESCRIPTION OF THE `NE VARIETUR' NOTE
The `ne varietur' note itself can prescribe, and being a demand note, the prescriptive period on the `ne varietur' note is five years. For that reason, until recently, it has been the customary practice to have the mortgagor sign a written acknowledgement on the `ne varietur' note within five years after execution of the note (and thereafter to repeat the procedure within five year periods) to prevent prescription from running. If he failed to do so, the `ne varietur' note prescribed, and while the hand note would nonetheless remain a valid obligation, it would no longer be secured by a mortgage and would simply reflect an unsecured debt (not `unsecured' legally, but unsecured practically in the sense *391 that the security is virtually worthless, being the pledge of a prescribed note). All too often lenders neglected or forgot (or were not advised) to obtain the written acknowledgement every five years, and found themselves holding prescribed mortgage notes. As a result, the Louisiana legislature enacted a special statute in 1970 to remedy the problem of prescription on notes such as the `ne varietur' note as it is used in the collateral mortgage situation. R.S. 9:5807 provides as follows:
`The partial payment of a promissory note by the maker thereof shall interrupt prescription upon any and all other promissory notes which have been pledged by said maker to secure the payment of the promissory note upon which the partial payment was made, if the pledged notes are held by the creditor to whom the partial payment was made, provided that in all such cases the creditor shall sustain the burden of proof that the pledged notes were in fact pledged to secure the note upon which the partial note [sic] was paid by the maker and that at the time of the partial payment the creditor receiving the partial payment was the holder of the pledged note or notes.'"
We find and hold, therefore, that upon prescription of the collateral mortgage note, there remained no outstanding mortgage against subject property. Consequently, the mortgage herein sought to be enforced was not extant against the property on the date of GSA's purchase.
As previously noted the hand note became the purely personal obligation of its maker upon prescription of the collateral mortgage note given as security therefor.
It is well settled that the promise to pay the debt of another must be express and in writing. La.C.C. articles 2278(3), 3039 W. H. Ward Lumber Co., Inc., et al. v. International City Bank & Trust Co., et al., 347 So.2d 322 (La., Ct.App. 4th Cir. 1977); General Electric Company v. Martin, 331 So.2d 228 (La., Ct.App. 4th Cir. 1976); Hunt v. Howard, 295 So.2d 864 (La. Ct.App., 2d Cir. 1974).
In this instance the obligation assumed by GSA was clear and specific. GSA assumed only mortgages, liens and judgments extant (outstanding and enforceable) against the property it purchased, on the date of its acquisition. GSA did not undertake to assume any personal obligation of its vendor or any other antecedent owner of the property in question. GSA neither endorsed the hand note nor expressly agreed to pay it.
The record is devoid of an express written instrument binding GSA to pay the personal obligation of the maker of the hand note involved herein. It follows that GSA may not be held liable for such personal liability. La.C.C. Article 2278(3).
The original opinion of this court casting GSA in liability pursuant to the hand note is annulled, reversed and set aside and judgment rendered herein declaring GSA to be free of liability with respect thereto. Except as herein amended and modified, our original decree is reaffirmed, all costs to be paid by plaintiffs.
Original opinion affirmed in part and reversed in part.
CALOGERO, J., concurs and assigns reasons.
CALOGERO, Justice, concurring.
I voted to grant not only the rehearing application of Guaranty Savings Assurance Company but also the rehearing application of National American Bank because I felt 1) that we probably erred in finding the collateral mortgage note and the mortgage prescribed and unenforceable, and 2) that we also probably erred in finding that Guaranty Savings Assurance Company was personally bound on the hand note and original obligation for having assumed the obligation represented by it.
This Court denied the application of National American Bank, while granting the application of Guaranty Savings Assurance Company.
*392 Because the only matter still live and before us is Guaranty Savings Assurance Company's liability (or non-liability) on the hand note, and because I agree with the majority's conclusion that Guaranty Savings Assurance Company did not assume the obligation under the hand note by assuming only valid extant mortgages or liens, I concur in the majority opinion herein.
NOTES
[1] We agree with the lower courts' finding that the parties intended the pledge to secure the ne varietur note, rather than the hand note. See 369 So.2d at 1112. Although a pledge to secure a collateral mortgage note is unusual, Nathan and Marshall, The Collateral Mortgage, 33 La.L.Rev. 497 (1973), such was the parties' intention in their pledge agreement.
[2] Actions on promissory notes are prescribed by five years. La.C.C. art. 3540. More than five years elapsed between the final interest payment on April 6, 1966 and the filing of the suit on November 15, 1974.
[3] In searching for origins of the constant acknowledgment rule, the first case we have found that mentioned it was Wilson v. Bannen, 1 Rob. 556 (1842). The court held that a pledge of goods on a ship operated as a constant acknowledgment of the owner's obligation to pay the ship its freight charges. The rationale for the rule is that the debtor makes an implied acknowledgment of the debt by delivering his property to the creditor in pledge. One writer has called this, appropriately, the "constant acknowledgment doctrine" and, in line with Planiol, has stated that the policy underlying the doctrine is to protect "the valuable right of the pledgee to retain possession of the thing pledged until he [is] paid." Comment, Pledge, Prescription, and the Succession of Picard, 10 Loy.L.Rev. 82, 84 (1959). However, as it has developed in Louisiana, the constant acknowledgment rule has come to mean that when there is a pledge, the principal obligation is imprescriptible, no matter what the value or nature of the thing pledged. Id. p. 88.
[4] Our decision in Picard that prescription was interrupted was based also on the pledgee's detention of pledged corporate stock. Although the corporation had been placed in receivership, and the stock presumably had diminished in value, the rights represented by the shares were still in existence and in the pledgee's possession.
[5] A natural obligation may also form the basis for a pledge, which is rendered valid when the natural obligation is confirmed and becomes executory. See La.C.C. art. 3139.
[6] Although the promise to sell an immovable may not be enforced unless it is in writing, La.C.C. art. 2462, there is no requirement that the parties' mutual consent to revoke a written contract be in writing. La.C.C. art. 1901. See Tholl Oil Co. v. Miller, 197 La. 976, 3 So.2d 97 (1941); Investors Homestead Ass'n v. Anglada, 193 La. 596, 192 So. 69 (1939); Parlor City Lumber Co. v. Sandel, 186 La. 982, 173 So. 737 (1937); Arceneaux v. Adams, 366 So.2d 1025 (La.App. 1st Cir. 1978); Torrey v. Simon-Torrey, Inc., 307 So.2d 569 (La.1974), Tate and Barham, JJ., dissenting on original hearing.
[1] "Extant" is defined in the Third Edition of Webster's New International Dictionary as "currently or actually existing: that is in existence; still existing: continuing to exist: maintaining existence: not exterminated, destroyed or lost."