# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
April 16, 2013

No. 11-31218

Lyle W. Cayce
Clerk

In the Matter of:  HARI AUM, LLC, doing business as Deluxe Motel,

Debtor

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HARI AUM, LLC, doing business as DELUXE MOTEL,

Appellant,

v.

FIRST GUARANTY BANK,

Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and DAVIS and CLEMENT, Circuit Judges.
CARL E. STEWART, Chief Judge:

This matter involves an appeal from a bankruptcy judge's interlocutory order and judgment.  The bankruptcy court ruled on cross-motions for partial summary judgment in favor of  Appellee First Guaranty Bank ("FGB") that the Multiple Indebtedness Mortgage that FGB recorded is valid, and that the property underlying that mortgage, the Deluxe Motel, secures both the loan FGB

No. 11-31218

made to Debtor-Appellant Hari Aum LLC ("Hari Aum") and the loan FGB made to a second entity, Mississippi Hospitality Services LLC. We now AFFIRM.

## I.

In 2005, Hari Aum, a limited liability company ("LLC") that one Suresh Bhula ("Bhula") wholly owned, borrowed $1.8 million from FGB to finance the purchase of the Deluxe Motel in Slidell, Louisiana. As the 100% shareholder, sole officer, and managing member of Hari Aum, Bhula signed both a promissory note and a Multiple Indebtedness Mortgage ("MIM"), dated January 27, 2005, on Hari Aum's behalf to evidence and secure the $1.8 million loan. Also on January 27, Hari Aum, through Bhula, signed a commercial security agreement giving FGB a security interest in all equipment, furniture, fixtures, and an assignment of rents and leases in the Deluxe Motel property. The MIM was properly recorded in St. Tammany Parish, Louisiana on February 1, 2005.

The pertinent sections of the MIM are as follows:

1. **MORTGAGE SECURING FUTURE INDEBTEDNESS.** This Mortgage has been executed by [Hari Aum] pursuant to Article 3298 of the Louisiana Civil Code for the purpose of securing [Hari Aum's] Indebtedness that *may now be existing or that may arise in the future* as provided herein . . . . However, *nothing under this Mortgage shall be construed as limiting the duration of this Mortgage or the . . . purposes for which [Hari Aum's] Indebtedness may be requested or extended.*

(italicized emphases added).

2. **INDEBTEDNESS.** The word "Indebtedness" as used in this Mortgage means individually, collectively and interchangeably *any and all present and future loans, advances, and/or other extensions of credit obtained and/or to be obtained by [Hari Aum] from [FGB] . . .* including without limitation, a Note dated January 27, 2005, in the principal amount of $1,800,000.00, from

2

No. 11-31218

> [Hari Aum] to [FGB], and any and all amendments thereto and/or substitutions therefor, and any and all renewals, extensions and refinancings thereof, as well as any and all other obligations, including, without limitation, [Hari Aum's] covenants and agreements in any present or future loan or credit agreement or any other agreement, document or instrument executed by [Hari Aum] and liabilities that [Hari Aum] *may now and/or in the future owe to and/or incur in favor of [FGB], whether direct or indirect, . . . and whether now existing or hereafter arising . . . whether [Hari Aum] is obligated alone or with others on a "solidary"[1] or "joint and several" basis, as a principal obligor or as a surety, guarantor, or endorser, of every nature and kind whatsoever . . . .* Notwithstanding any other provision of this Mortgage, the maximum amount of Indebtedness secured hereby *shall be limited to $50,000,000.00."*

(italicized emphases added).

Thus, the notable features of the MIM's definition of "Indebtedness" are: 1) the MIM secures present *and* future loans between Hari Aum and FGB; 2) the obligation broadly contemplates and includes the debts of third parties, whether Hari Aum is the principal obligor or obligated on a "joint and several" basis with others; and 3) the maximum amount of the Indebtedness secured is limited to $50 million. The MIM also states that Hari Aum pledged the Deluxe Motel as security for Hari Aum's "Indebtedness" between itself and FGB. Notably, only Hari Aum and FGB are parties to this MIM. Additionally, the MIM provides the mechanisms for cancellation of the instrument in the provision entitled, "Duration of Mortgage."

Bhula and FGB continued their relationship in 2006, when Bhula obtained a commitment letter from FGB, dated May 31, 2006, by which FGB agreed to

---

[1] "Solidary" is an alternative term for "joint and several" in the context of a liability or obligation. Black's Law Dictionary 1521 (9th ed. 2009).

finance the purchase of a hotel in Hattiesburg, Mississippi through a new entity that was not yet formed.  Thereafter, Bhula formed a second LLC, Mississippi Hospitality Services, LLC ("MHS"), of which Bhula was also the 100% shareholder, sole officer, and managing member.  The loan between FGB and MHS was for $4.9 million, and was secured by a deed of trust that was properly recorded in Forrest County, Mississippi on June 19, 2006.  MHS also entered into a commercial security agreement with FGB, dated June 16, 2006, which gave FGB a security interest in all inventory, equipment, general intangibles, consumer goods and fixtures, and an assignment of rents and leases for the Hattiesburg property. The commitment letter specifically states that the Deluxe Motel and the 160-unit hotel in Hattiesburg were to serve as collateral for FGB's loan to MHS.  The pertinent documents that Bhula executed in 2006 in connection with the MHS loan do not demonstrate that the parties took any specific steps to encumber the Deluxe Motel property as security for the MHS loan at that time, however.

Also on May 31, 2006, the U.S. Small Business Administration ("SBA") advanced a Disaster Loan in the amount of $735,000 to Hari Aum to repair roof damage associated with Hurricane Katrina.  Hari Aum, through Bhula, signed a note and multiple indebtedness mortgage in favor of the SBA on June 13, 2006, and this mortgage was recorded in St. Tammany Parish, Louisiana on July 10, 2006.  Pursuant to this filing, Hari Aum granted the SBA a second mortgage interest on the Deluxe Motel.

On April 21, 2009, FGB refinanced both Hari Aum's $1.8 million loan and MHS's $4.9 million loan.  Bhula signed new promissory notes on behalf of each of the LLCs, as well as a commercial guaranty personally obligating Bhula on Hari Aum's loan.  Also on April 21, Bhula executed two other documents: 1) A Limited Liability Company Resolution to Borrow/Grant Collateral ("Resolution"), on behalf of Hari Aum; and 2) Hari Aum's Acknowledgment of Existing Multiple

Indebtedness Mortgage ("Acknowledgment").  In addition to the 2005 MIM, the Resolution, the Acknowledgment, and the 2009 MHS promissory note are the central documents to our resolution of this appeal.

The Resolution broadly authorizes Bhula to pledge Hari Aum's real property as security for any future indebtedness.  The company grants Bhula the authority to enter into transactions concerning the company's real estate, including the pledging of collateral to secure debt between Hari Aum and FGB. The Resolution states, in pertinent part:

> RESOLUTIONS ADOPTED.  At a meeting of the members of [Hari Aum], duly called and held on April 21, 2009, at which a quorum was present and voting, or by other duly authorized action in lieu of a meeting, the resolutions set forth in this Resolution were adopted.[2]
>
> MEMBER.  The following named person is a member of HARI AUM, LLC: Suresh A. Bhula, Member [designated as an authorized person]
>
> ACTIONS AUTHORIZED.  Any one (1) of the authorized person listed above may enter into any agreements of any nature with [FGB], and *those agreements will bind [Hari Aum].*  Specifically, but without limitation, any one (1) of such authorized person is authorized, empowered, and directed to do the following for and on behalf of [Hari Aum]: . . . .
>
>> **Grant Security.**  *To mortgage, pledge, transfer, endorse, hypothecate, or otherwise encumber and deliver* to [FGB] any property now or hereafter belonging to [Hari Aum] or in which [Hari Aum] now or hereafter may have an interest, including without limitation all of [Hari Aum's] real (immovable) property . . . as security for

---

[2] As the bankruptcy court observed, it is unclear which other "members" would have attended this meeting, since Bhula was the sole member of Hari Aum.

No. 11-31218

the payment of any loans or credit accommodations so obtained . . . or any other or further indebtedness of [Hari Aum] to [FGB] . . . . *Such property may be mortgaged, pledged, transferred, endorsed, hypothecated, encumbered or otherwise secured . . . . .*

**Execute Security Documents.** To execute and deliver to [FGB] the forms of mortgage, collateral mortgage, deed of trust, pledge agreement, hypothecation agreement, and other security agreements and financing statements which [FGB] may require which shall evidence the terms and conditions under and pursuant to which such liens and encumbrances, or any of them, are given . . . .

CONTINUING VALIDITY. Any and all acts authorized pursuant to this Resolution and performed prior to the passage of this Resolution are hereby ratified and approved. This Resolution shall be continuing, shall remain in full force and effect and [FGB] may rely on it until written notice of its revocation shall have been delivered to and received by [FGB] at [FGB's] address shown above.

(italicized emphases added).

The Acknowledgment indicates that Hari Aum's 2005 MIM "shall secure any and all of [MHS's] and [Hari Aum's] present and future indebtedness in favor of [FGB]," and that Hari Aum and MHS will be jointly and severally liable for all indebtedness, including the MIM and MHS's promissory note with FGB. The Acknowledgment identifies MHS as the "Borrower," Hari Aum as the "Grantor," and FGB as the "Lender." The Acknowledgment provides, in relevant part, as follows:

6

No. 11-31218

MULTIPLE INDEBTEDNESS MORTGAGE. Desiring to secure the prompt and punctual payment and satisfaction of present and future Indebtedness may be outstanding from time to time, one or more times, as provided herein, [Hari Aum] previously executed the following described[.]

MORTGAGE.    The word "Mortgage" means the multiple indebtedness mortgage described in the "Multiple Indebtedness Mortgage" paragraph in favor of [FGB]:

> **a multiple Indebtedness mortgage dated 01/27/2005 executed by Hari Aum, LLC in favor of [FGB].**

CONTINUING SECURITY INTEREST TO SECURE PRESENT AND FUTURE INDEBTEDNESS. *Hari Aum reaffirms that [Hari Aum's] Mortgage was intended to and shall secure any and all of [MHS's] and [Hari Aum's] present and future Indebtedness in favor of [FGB]* as may be outstanding from time to time, one or more times, including [MHS's] loan and promissory note described therein. . . .

WAIVERS. [Hari Aum] hereby waives presentment for payment, protest and notice of protest and of nonpayment, and all pleas of division and discussion with regard to the Indebtedness. *[Hari Aum] agrees that [Hari Aum] shall remain liable together with [MHS] and any and all guarantors, endorsers and sureties of the Indebtedness on a "joint and several" or "solidary" basis.* . . .

FURTHER COVENANTS.    [Hari Aum] further represents, warrants and agrees that: (A) *[Hari Aum] has agreed and consented to grant the security interest provided herein to secure payment of [MHS's] Indebtedness in favor of [FGB]* at [MHS's] request and not at the request of [FGB]; (B) [Hari Aum] will receive and/or has received a direct or indirect material benefit

7

No. 11-31218

from the transactions contemplated herein and/or arising out of [MHS's] Indebtedness . . . .

DEFINITIONS. . . .

> Note. *The word "Note" means the Note executed by MISSISSIPPI HOSPITALITY SERVICES, LLC in the principal amount of $4,375,290.81 dated April 21, 2009* together with all renewals, extensions, modifications, refinancing, consolidations and substitutions of and for the note or credit agreement.

(italicized emphases added).

The MHS promissory note that Bhula executed on April 21, 2009 with FGB identifies, *inter alia*, Hari Aum's 2005 MIM as one of the forms of collateral securing the note.

Both Hari Aum and MHS subsequently defaulted on making their respective loan payments. On August 12, 2010, Hari Aum filed a Chapter 11 petition for reorganization. Through the bankruptcy adversary proceeding, the parties sought the court's determination of whether the Deluxe Motel serves as security for only the loan between Hari Aum and FGB or also for the loan between MHS and FGB. Hari Aum asserted that the MIM does not secure the MHS loan, while FGB argued to the contrary. The SBA also filed an unopposed motion to intervene in the proceeding, which the bankruptcy court granted. The SBA essentially agreed with Hari Aum that the MIM does not secure the MHS loan.

On July 12, 2011, the bankruptcy court issued its Memorandum Opinion, concluding that: 1) the MIM allowed FGB to secure future loans without recording further documents associated with those loans; 2) Bhula was authorized to pledge Hari Aum's property to secure MHS's debt by virtue of the Resolution; and 3) the MIM, MHS's 2009 promissory note, and the

No. 11-31218

Acknowledgment together effectuated a cross-collateralization whereby Hari Aum granted FGB a security interest in Hari Aum's Deluxe Motel to secure FGB's loan to MHS.

Hari Aum filed for leave to appeal the bankruptcy court's interlocutory judgment in the district court. While the motion was pending, the bankruptcy court, *sua sponte*, certified its judgment for direct appeal to this court, pursuant to 28 U.S.C. § 158(d)(2)(A)(i) and (iii). We subsequently granted leave to appeal.

## II.

"When directly reviewing an order of the bankruptcy court, we apply the same standard of review that would have been used by the district court. Findings of fact are reviewed for clear error, and conclusions of law are reviewed de novo." *In re Halo Wireless, Inc.*, 684 F.3d 581, 586 (5th Cir. 2012) (citations omitted).

## III.

As the express language of the 2005 MIM indicates, the instrument was executed pursuant to Article 3298 of the Louisiana Civil Code ("Article 3298"). La. C.C. art. 3298. As an issue of first impression, we are called upon to interpret Article 3298, which no published Louisiana case has yet to interpret or apply even though the provision has been in effect since January 1, 1992.[3] Thus, the plain language of the provision and the Legislature's Revision Comments attending the Article's enactment are particularly instructive. Further, we recently affirmed a district court's application of Article 3298 in *KeyBank National Association v. Perkins Rowe Associates, LLC* in an unpublished decision by adopting the reasoning of the district court. 823 F. Supp. 2d 399, 408 (M.D. La. 2011), *aff'd by* No. 12-30184, 2012 WL 6605767, at *1 (5th Cir. Dec. 19, 2012) ("After reviewing the record, studying the briefs, and

---

[3] Several Louisiana cases have interpreted a pre-1992 version of the Article.

No. 11-31218

listening to oral arguments, we [affirm] the judgment of the district court for essentially the same reasons given by the district court in its well-reasoned Ruling on Motions for Summary Judgment.").

## A.    Article 3298 of the Louisiana Civil Code

Article 3298, entitled, "Mortgage May Secure Future Obligations," provides, in relevant part, as follows:[4]

> A.  A mortgage may secure obligations that may arise in the future.
>
> B.  As to all obligations, present and future, secured by the mortgage, notwithstanding the nature of such obligations or the date they arise, the mortgage has effect between the parties from the time the mortgage is established and as to third persons from the time the contract of mortgage is filed for registry.
>
> C.  A promissory note or other evidence of indebtedness secured by a mortgage need not be paraphed for identification[5] with the mortgage and need not recite that it is secured by the mortgage . . . .

La. C.C. art. 3298 (A)-(C).

The 1991 Revision Comments ("Comments") further explain the purpose of Article 3298 and mortgages enacted pursuant to the provision:

> (a) . . . [T]his Article . . . . is intended to provide a direct and convenient substitute for the so-called collateral mortgage. . . and to permit a person to mortgage his

---

[4] A mortgage "is a nonpossessory right created over property to secure the performance of an obligation."  La. C.C. art. 3278.  A mortgage "is accessory to the obligation it secures." La. C.C. art. 3282.

[5] Under Louisiana civil law, a "paraph" is a notary's signature evidencing an obligation, such as a mortgage.  *See, e.g.*, Black's Law Dictionary 1220-21 (defining "paraph," in the civil law context, as "[a] signature itself; esp., a notary public's signature on a document, followed by the date, names of the parties, and seal").  Thus, a promissory note "paraphed for identification with a mortgage" is a note that is specifically linked to a mortgage in this manner.

10

No. 11-31218

property to secure a line of credit, or even to secure obligations that may not then be contemplated by him except in the broadest sense of an expectation that he may some day incur an obligation to the mortgagee. . . .

(b) The expression in Paragraph A that "a mortgage may secure" is intended to emphasize that a mortgage securing future obligations is not a distinct or different form of mortgage. A mortgage may secure existing obligations; obligations contemporaneously incurred with the execution of the mortgage or specific identifiable or particular and limited future obligations; or general and indefinite future obligations; or any combination of them. The matter is one of contract, not law . . . .

(c) Paragraph B declares that a mortgage securing future obligations has the same effect and priority it would have if the obligations were in existence when the contract of mortgage was entered into. . . .

(d) The effect and rank of a mortgage securing future obligations thus essentially corresponds to the effect and rank which it would have if it secured a collateral note that was pledged to secure the future obligations, with the exception that the Article does not require that there initially be a debt or commitment in order to give vitality to the mortgage. Of course, the contract of mortgage must be in existence and, to affect third persons acquiring rights in and to the thing mortgaged, it must be recorded. Once recorded, however, it serves notice to the world that, until released or cancelled, it encumbers the property it describes to secure the obligations it contemplates.

La. C.C. art. 3298, Revision Comments (a)-(d) (1991) (internal citations omitted).

Mortgages issued pursuant to Article 3298 are known as "multiple indebtedness mortgages," "future advance mortgages," or "equity line mortgages" (collectively, "MIMs"). *See* Kathy D. Underwood, *Future Advance Mortgage*, La.

No. 11-31218

Practice La. Notary Handbook § 20:17 n.3 (2012-2013 ed.). As the Comments indicate, MIMs are intended to be "a direct and convenient substitute for the so-called collateral mortgage." La. C.C. art. 3298, Revision Comment (a).

The Louisiana Supreme Court has described the collateral mortgage as not a "pure" mortgage but the "result of judicial recognition that one can pledge a note secured by a mortgage and use this pledge to secure yet another debt." *First Guar. Bank v. Alford*, 366 So. 2d 1299, 1302 (La. 1978). Further, "[a] collateral mortgage indirectly secures a debt via a pledge." *Id.* It "consists of at least three documents, and takes several steps to complete":

> First, there is a promissory note, usually called a collateral mortgage note . . . . The collateral mortgage note is secured by a mortgage, the so-called collateral mortgage. The mortgage provides the creditor with security in the enforcement of the collateral mortgage note. . . . [M]oney is not directly advanced on the note that is paraphed for identification with the act of mortgage. Rather, the collateral mortgage note and the mortgage which secures it are Pledged [sic] to secure a debt.

*Id.*

Given the relationship between MIMs and collateral mortgages, secondary sources have discussed the similarities and differences between collateral mortgages and MIMs in order to illustrate the features of MIMs. The bankruptcy court relied on a law review article that, *inter alia*, compares MIMs to collateral mortgages. *See* David S. Willenzik, *Future Advance Priority Rights of Louisiana Collateral Mortgages: Legislative Revisions, New Rules, and a Modern Alternative*, 55 La. L. Rev. 1 (1994). We and the Louisiana Supreme Court have cited this article previously for other purposes. *See Keenan v. Donaldson, Lufkin & Jenrette, Inc.*, 529 F.3d 569, 575 (5th Cir. 2008); *Whitney Nat'l Bank v. Rockwell*, 661 So. 2d 1325, 1330 (La. 1995).

In distilling Article 3298, Willenzik describes MIMs as follows:

No. 11-31218

> If a multiple indebtedness mortgage is properly executed and filed, and if the mortgage contains broadly drafted future advance/cross-collateralization language, then any and all present and future extensions of credit and other obligations the borrower may obtain from or incur in favor of the mortgagee, or its successors and assigns, while the mortgage remains effective, will be secured by the mortgage up to the maximum dollar limitation stipulated in the mortgage agreement, with retroactive priority rights over intervening creditors dating back to the time the mortgage originally was filed in the public records.

*Id.* at 50-51 (citation omitted).

Accordingly, Willenzik identifies several essential features of MIMs that are relevant for our purposes. First, "[a] multiple indebtedness mortgage agreement must always be granted in favor of a specifically named and designated mortgagee." *Id.* at 52 (citations omitted). Second, "[a] multiple indebtedness mortgage agreement . . . provides that the mortgage itself is being granted directly to secure the on-going present and future indebtedness of the borrower in favor of the specified mortgagee," and thus, there is no reference to a specific pledge agreement.[6] *Id.* at 53. Third, the definition of "indebtedness" in the MIM must contemplate both present and future indebtedness. *Id.* Fourth, the MIM agreement must specify a maximum secured indebtedness amount. *Id.* at 53 (citing La. C.C. art. 3288). Fifth, the MIM should reference Article 3298 specifically. *Id.* at 54. Sixth, the MIM should provide the procedures for canceling the mortgage. *Id.* Lastly, a "promissory note or other

---

[6] Here, Willenzik contrasts the MIM with a collateral mortgage: "A collateral mortgage agreement specifies that the mortgage is being granted to secure a demand collateral mortgage note, which in turn is pledged under a separate collateral pledge or a U.C.C. security agreement to secure the borrower's present and future indebtedness." Willenzik, 55 La. L. Rev. at 53. Willenzik thus illustrates how the procedure for effectuating a MIM is more straightforward and less onerous than the procedure for achieving a collateral mortgage. *See id.*

evidence of indebtedness secured by a multiple indebtedness mortgage . . . need not be paraphed for identification with the mortgage." *Id.* at 55 (quoting La. C.C. art. 3298(C)).

In *KeyBank*, the district court also noted several characteristics of mortgages made pursuant to Article 3298:

> Historically, to secure an obligation that had not yet arisen, parties in Louisiana were forced to resort to a collateral mortgage, but the legislature in 1991 altered the code to reflect a new iteration of a conventional mortgage–the mortgage to secure future obligations. . . . [Article 3298] did away with the collateral mortgage requirement that the adjoining obligation supporting the mortgage be paraphed for identification to the mortgage.

823 F. Supp. 2d at 405 (citing La. C.C. art. 3298(C)). The court further observed, "Article 3298 declares a policy demanding recognition of a mortgage at its date of recordation, regardless of when the obligation is actually incurred." *Id.* at 408.

## B.    Louisiana's Public Records Doctrine

A principle of central importance to mortgages under Louisiana law is the public records doctrine, which is captured in Articles 1839 and 3338 of the Louisiana Civil Code.

Article 1839, "Transfer of Immovable Property,"[7] states, in relevant part, that "[a]n instrument involving immovable property shall have effect against third persons only from the time it is filed for registry in the parish where the property is located." La. C.C. art. 1839. Article 3338, entitled, "Instruments Creating Real Rights in Immovables; Recordation Required to Affect Third Persons," echoes this concept and identifies the types of instruments that must be publicly recorded:

---

[7] Under Louisiana law, "immovable property" is real property. La. C.C. art. 462 ("Tracts of land, with their component parts, are immovables.").

No. 11-31218

> The rights and obligations established or created by the following written instruments are without effect as to a third person unless the instrument is registered by recording it in the appropriate mortgage or conveyance records pursuant to the provisions of this Title:
>
> (1)  An instrument that transfers an immovable or establishes a real right in or over an immovable.
>
> (2)  The lease of an immovable.
>
> (3)  An option or right of first refusal, or a contract to buy, sell, or lease an immovable or to establish a real right in or over an immovable.
>
> (4)  An instrument that modifies, terminates, or transfers the rights created or evidenced by the instruments described in Subparagraphs (1) through (3) of this Article.

La. C.C. art. 3338; *see also McDuffie v. Walker*, 51 So. 100, 105-06 (La. 1909) (holding that an unrecorded contract affecting immovable property has no effect as to third persons, even when a third person has actual knowledge of that unrecorded contract).

## IV.

We first address the validity of the 2005 MIM before turning to the question of whether the subsequent agreements that Hari Aum, FGB, and MHS executed reflect an effective cross-collateralization of the Deluxe Motel, as the 2005 MIM's collateral, for MHS's loan.

**A.    The Validity of the 2005 MIM**

Hari Aum's challenge to the validity of the 2005 MIM is intertwined with its challenge of the bankruptcy court's conclusion that Hari Aum agreed to secure MHS's loan from FGB.  Hari Aum points out that the MIM "addresses only present and future debt obligations *owed by Hari Aum to FGB.*  None of the

15

language contained in this document directly and/or by reference identifies any third party loan obligations, specifically the debt of Mississippi Hospitality." Accordingly, Hari Aum argues that, for FGB to have a mortgage on Hari Aum's property to secure *MHS's debt*, "there must be a document existing evidencing such debt obligation." Hari Aum invokes several other provisions of the Civil Code to argue essentially that FGB's failure to amend the MIM properly to include MHS's debt or to publicly record a mortgage whereby the MIM specifically secures MHS's debt renders the purported cross-collateralization ineffective. Hari Aum contends that, by finding that only the recorded MIM was necessary and that no additional, recorded documents were necessary to evidence the transactions here, the bankruptcy court erred by concluding that Article 3298 "trumps" the public records doctrine. Additionally, Hari Aum suggests that the 2009 refinancing of FGB's loan to Hari Aum effectively extinguished the original MIM such that FGB would have needed to record a new MIM or record amendments to the prior MIM in order for it to be valid. Accordingly, any purported amendments to the MIM are ineffective, at the least.

FGB argues that the 2005 MIM is valid and thus secures Hari Aum's indebtedness to FGB up to the stated amount of $50 million. FGB further asserts that no additional documents were necessary to secure any future loans that Hari Aum incurred up to this maximum amount. FGB therefore argues that Hari Aum's subsequent agreements to be jointly and severally liable for MHS's loan and to pledge the MIM as collateral for the MHS loan fall within the MIM's broad definition of "Indebtedness." According to FGB, the 2005 MIM is thus valid in full–including as to MHS's debt–as of the mortgage's original recordation date.

The bankruptcy court concluded that the 2005 MIM between Hari Aum and FGB sufficiently secured Hari Aum's future indebtedness to FGB up to $50 million and thus, that no additional, publicly-recorded documents were

necessary to evidence Hari Aum's indebtedness that did not exceed this amount. We agree with the bankruptcy court. The 2005 MIM satisfies all of the relevant, enumerated requirements under the Louisiana Civil Code for the creation of a valid MIM: 1) it is granted in favor a specific mortgagee, FGB; 2) it expressly provides that it secures Hari Aum's present and future indebtedness to that mortgagee; 3) its definition of "Indebtedness" includes both present and future debt; 4) it provides a specific, maximum indebtedness amount of $50 million; 5) it references Article 3298 specifically; and 6) it provides the methods for canceling the MIM.

Further, both the statutory guidance and secondary sources indicate that, once the MIM is recorded in the public registry, it has effect as to third parties and secures any types of obligations described in the MIM. Thus, Hari Aum's argument that the bankruptcy court erred by ignoring the public records doctrine to conclude that Article 3298 "trumps" the doctrine is unavailing. To the contrary, the plain language of and Comments to Article 3298 indicate that Article 3298 *incorporates* the public records doctrine, insofar as it requires MIMs to be publicly recorded in order to affect third parties. La. C.C. art. 3298(B) ("[T]he mortgage has effect . . . as to third persons from the time the contract of mortgage is filed for registry."); *id.*, Revision Comment (d). Accordingly, there appears to be no tension in acknowledging the validity of the 2005 MIM under Article 3298 in light of the public records doctrine, as Hari Aum argues.

Moreover, Article 3298 makes clear that MIMs will not be invalidated or canceled even if there is no underlying obligation outstanding at a given time, until the parties affirmatively cancel the mortgage.[8]  *See* La. C.C. art. 3298,

---

[8] We note, however, that the Louisiana Attorney General issued an advisory opinion in 2009 opining that a mortgage issued pursuant to Article 3298 would need to be reinscribed, or renewed, after ten years under other provisions of the Civil Code. *See* La. Att'y Gen. Op. No. 08-0228 (2009), 2009 WL 1416432, at *2 (Apr. 27, 2009) ("[I]t is the opinion of this office that a mortgage to secure future obligations that does not describe the maturity of any

Revision Comment (f) ("If . . . the mortgage secures future, indefinite obligations with a maximum limit on their aggregate balance from time to time, then in essence, the mortgage continues indefinitely until it is terminated by notice of the mortgagor or the consent of the parties, or in some other manner recognized by law."). Louisiana statutory law also "provides that amendments and modifications to security agreements are valid, but may rank from the date of the amendment's recording *if the amount of indebtedness increases*" beyond the maximum contained in original instrument. *KeyBank*, 823 F. Supp. 2d at 410 (citing La. R.S. 9:5390(B)).[9]

Here, there was no increase in the maximum indebtedness of the 2005 MIM–in excess of $50 million–when Hari Aum assumed MHS's debt; thus, further recordation was not necessary. For example, in *KeyBank,* the bank made certain amendments and modifications to the subject MIM and relevant promissory notes through consolidation, which did not increase the amount of secured indebtedness beyond the maximum aggregate principal stated in the earliest original mortgage. *Id.* at 410-11. The *KeyBank* court thus held that these amendments and modifications did not preclude the bank from using the

---

obligation that it secures must be reinscribed within ten years from the date of the mortgage."). As the original MIM here was recorded in 2005, this case does not implicate this ten-year reinscription period.

[9] La. R.S. 9:5390(B) provides, in relevant part:

> To the extent that the renewal or refinancing note or notes evidence an increase in the secured principal indebtedness [stated in the mortgage] (other than the increase that results from the conversion of unpaid accrued interest to principal), the mortgage with respect to the increase in the secured principal indebtedness shall rank from the date of the filing of an amendment to the mortgage reflecting the execution and delivery of such renewal or refinancing note or notes.

recordation date of the original mortgage to establish its security interest in the subject real estate. *Id.* at 411 ("[T]he amendments and modifications to the previous notes and mortgages were not invalid and did not defeat KeyBank's right to use the date of the original Wachovia mortgage to determine its priority position. The Wachovia mortgage stated the maximum principal amount of the secured debt as $200 million, and KeyBank's obligations never surpassed that amount.").

With respect to the MIM's cousin, the collateral mortgage, the Louisiana Supreme Court also has acknowledged that the collateral mortgage endures even if the underlying obligation is paid. *Alford*, 366 So. 2d at 1302. The *Alford* court stated: "A collateral mortgage note may be pledged to secure future obligations. In that event full payment of a given obligation will not extinguish the collateral mortgage note and accompanying mortgage. (And in such cases the collateral mortgage will have a ranking from the initial pledge.)" *Id.* (citing La. C.C. art. 3158); *see also In re Charrier*, 167 F.3d 229, 234 (5th Cir. 1999) ("[The] language [of the collateral mortgage, which] . . . specifically authorized future advances. . . . together with the Charriers' failure to retrieve the collateral mortgage note or seek its cancellation after paying off the original debt . . . , and their repeated willingness to accept new loans based on the purported pledge of the 1979 collateral mortgage package, are clear indicators of the Charriers' intent to secure future indebtednesses with that collateral.").

Accordingly, we conclude that the 2005 MIM here was effective to secure Hari Aum's future indebtedness up to $50 million. Moreover, the 2009 refinancings did not invalidate the 2005 MIM or require further recordation, since they did not increase the amount of secured indebtedness to more than $50 million. *See* La. R.S. 9:5390(B); *KeyBank*, 823 F. Supp. 2d at 410-11.

The resolution of this question–whether the 2005 MIM is valid–is a threshold consideration for determining whether the subsequent agreements

between Hari Aum, FGB, and MHS bring MHS's loan within the ambit of the MIM.  If valid, the MIM secures Hari Aum's future indebtedness to FGB up to $50 million, whether Hari Aum is the principal obligor for a debt or jointly and severally liable for the debt.  Thus, the question becomes whether the 2009 Resolution and the 2009 Acknowledgment effectively demonstrate that the Deluxe Motel, as the underlying collateral for the MIM, secures MHS's loan, where Hari Aum agreed to be held jointly and severally liable for MHS's loan and where Hari Aum pledged the MIM as collateral for FGB's loan to MHS.

**B.    The Effectiveness of the Cross-Collateralization of the Deluxe Motel for the MHS Note**

Related to the issue of the effectiveness of the cross-collateralization is the threshold question of whether Bhula, as the sole member of Hari Aum, had the authority to pledge Hari Aum's collateral to secure MHS's debt.

*1.    The Authority of an LLC's Managing Member to Pledge Collateral*

Under Louisiana statutory law, a managing member of an LLC may act as "a mandatary [or agent] of the limited liability company for all matters in the ordinary course of its business other than the alienation, lease, or encumbrance of its immovables." La. R.S. 12:1317(A).  Thus, unless otherwise provided in the LLC's articles of organization or a written operating agreement, "a majority vote of the members shall be required to approve [*inter alia*] . . . [t]he alienation, lease, or encumbrance of any immovables of the limited liability company." La. R.S. 12:1318(B).

Hari Aum contends that there was no valid, written resolution authorizing Bhula to pledge Hari Aum's 2005 MIM to secure MHS's loan, while FGB asserts that the Resolution here validly conferred this authority on Bhula.  We conclude, as the bankruptcy court did, that Bhula had the authority to pledge the MIM based on the relevant law, and also based on common sense.  Bhula is the sole managing member of Hari Aum, and he signed both the Resolution and the

No. 11-31218

Acknowledgment expressly on behalf of Hari Aum. The Resolution granted Bhula the authority to "pledge . . . or otherwise encumber and deliver to [FGB] . . . all of [Hari Aum's] real (immovable) property . . . as security for . . . any other or further indebtedness of [Hari Aum] to [FGB]." As the Resolution comported with the requirements of the law–approval by a majority of the LLC's members of a manager's pledge of the company's real property–this document is determinative of this threshold issue. Hari Aum points to no persuasive authority that leads us to conclude to the contrary.

    *2.    Hari Aum's Agreement to be Jointly and Severally Liable for MHS's Loan and Hari Aum's Pledge of its Collateral to Secure MHS's Loan*

As the Comments to Article 3298 state, "a mortgage may secure existing obligations; obligations contemporaneously incurred with the execution of the mortgage or specific identifiable or particular and limited future obligations; or general and indefinite future obligations; or any combination of them. *The matter is one of contract,* not law. . . ." La. C.C. art. 3298, Revision Comment (b) (emphasis added). Further, contracts have the effect of law between the parties and courts enforce them according to the true intent of the parties. La. C.C. arts. 1983, 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046.

At the heart of this appeal, from Hari Aum's perspective, is the apparent tension between Article 3298 and the public records doctrine. Hari Aum argues that the Acknowledgment is the type of document for which Louisiana law requires recordation. Therefore, because the Acknowledgment was not recorded, it is invalid. Relatedly, Hari Aum contends that, for the cross-collateralization to be effective, FGB needed to publicly record an amendment to the MIM that specifically evidences the inclusion of MHS's loan. Hari Aum also maintains that the Acknowledgment is vague and ambiguous and, thus, it must be

21

construed against the drafter, *i.e.*, FGB. Hari Aum further argues that FGB fails to prove the creation of a surety or guarantor relationship between Hari Aum and MHS regarding MHS's loan from FGB.

FGB argues that the Acknowledgment demonstrates that Hari Aum expressly and unambiguously agreed to be jointly and severally liable for MHS's debt and clearly pledged the MIM to secure MHS's debt. FGB further asserts that no additional documents were necessary to evidence Hari Aum's assumption of this debt. FGB suggests that Hari Aum's agreement to assume MHS's debt is a relatively straightforward exercise in contractual interpretation and that the relevant documents are unambiguous.

We agree with the bankruptcy court's conclusion regarding the effect of the loan documents that Hari Aum, MHS, and FGB executed, *i.e.*, that they effectuated a cross-collateralization whereby Hari Aum's Deluxe Motel, as the underlying collateral for the 2005 MIM, also secures MHS's loan from FGB. The bankruptcy court made this conclusion on two alternative theories: 1) Hari Aum became personally liable for MHS's debt when it agreed, in the Acknowledgment, to be held "jointly and severally liable" for MHS's loan from FGB; and 2) Hari Aum successfully pledged the 2005 MIM to secure MHS's debt to FGB.

Bhulah signed the Acknowledgment on behalf of Hari Aum, and the Acknowledgment expressly and unambiguously reflects Hari Aum's intent to be personally liable for MHS's loan from FGB:

> 1. "[Hari Aum] reaffirms that [Hari Aum's] Mortgage was intended to and shall secure any and all of [MHS's] and [Hari Aum's] present and future Indebtedness in favor of [FGB]";
>
> 2. "[Hari Aum] agrees that [Hari Aum] shall remain liable together with [MHS] and any and all guarantors, endorsers and sureties of the Indebtedness on a 'joint and several' or 'solidary' basis";

No. 11-31218

> 3. "[Hari Aum] further represents, warrants and agrees that: (A) [Hari Aum] has agreed and consented to grant the security interest provided herein to secure payment of [MHS's] Indebtedness in favor of [FGB][.]"

*See* La. C.C. art. 1796 ("A solidary obligation arises from a clear expression of the parties' intent or from the law."); *see also Kaplan v. Univ. Lake Corp.*, 381 So. 2d 385, 391 (La. 1979) ("It is well settled that the promise to pay the debt of another must be express and in writing."). As Hari Aum is personally liable for MHS's loan from FGB and the 2005 MIM contemplates future indebtedness between Hari Aum and FGB, MHS's loan thus falls within the MIM's broad definition of Hari Aum's "Indebtedness" to FGB.

Further, the Resolution, the Acknowledgment, and MHS's 2009 promissory note clearly illustrate Hari Aum's agreement to pledge the MIM to secure MHS's loan. La. C.C. art. 3133 (defining a pledge as "a contract by which one debtor gives something to his creditor as a security for his debt"); *id.* art. 3141 ("A person may give a pledge, not only for his own debt, but for that of another also."). The Resolution grants Bhula the authority to pledge Hari Aum's real property as security for any future indebtedness. In the Acknowledgment, Hari Aum then pledges the MIM as security for MHS's loan from FGB, stating that Hari Aum "grant[s] the security interest provided herein [the MIM] to secure payment of [MHS's] Indebtedness in favor of [FGB]." As we have noted, Hari Aum (through Bhula) signed the Acknowledgment, which is the principal document evidencing this pledge. Finally, MHS's 2009 promissory note identifies Hari Aum's 2005 MIM as one of the forms of collateral securing the note. These documents together illustrate the clear intent of the parties. *See* La. C.C. art. 2046.

Moreover, our discussion regarding the applicability of the public records doctrine to MIMs elucidates the issues here too. Just as the amendments to the

mortgages and promissory notes in *KeyBank* did not require recordation, neither the Acknowledgment nor the 2009 MHS promissory note here required recordation, as long as these alterations did not exceed the total indebtedness permitted under the pre-existing 2005 MIM, which they did not. *See* La. R.S. 9:5390(B); *KeyBank*, 823 F. Supp. 2d at 410-11. Indeed, it would be counter-intuitive to require that the Acknowledgment be recorded, as a mere pledge of an existing, unaltered mortgage, while amendments to a mortgage would not need to be recorded. As the Comments to Article 3298 clearly state, "Once recorded . . . [the mortgage securing future obligations] serves notice to the world that, until released or cancelled, it encumbers the property it describes to secure the obligations it contemplates." La. C.C. art. 3298, Revision Comment (d).

Hari Aum's arguments that additional documents needed to be recorded are red herrings. There is no new mortgage here. Moreover, based on the structure of MIMs under the Civil Code and related statutes, the bankruptcy court is correct that "[m]any, if not all, of the [Hari Aum's] arguments are inapplicable if the MIM is compared to and recognized to be an improvement of, the collateral mortgage/pledge agreement previously used by banks and other lenders in Louisiana." As Hari Aum validly agreed to be jointly and severally liable for MHS's loan and to secure MHS's loan with the MIM, that loan simply constitutes part of Hari Aum's future "Indebtedness" that the 2005 MIM contemplates. As a result, the MIM and, thus, the Deluxe Motel, secures MHS's loan from FGB.[10]

---

[10] Moreover, based on these conclusions, it is apparent that the obligations secured by the 2005 MIM have priority over the SBA's second mortgage on the Deluxe Motel, since that second mortgage was recorded after the MIM, on July 10, 2006. *See* La. C.C. art. 3298, Revision Comment (c) (stating that "a mortgage securing future obligations has the same effect and priority it would have if the obligations were in existence when the contract of mortgage was entered into").

No. 11-31218

## V.

For the foregoing reasons, we AFFIRM the bankruptcy court in all respects and REMAND for further proceedings.